JM VIDAL, INC., Plaintiff,

v.

TEXDIS USA, INC. and Distex, Inc., Defendants.

No. 08 Civ. 6398 (CM)(KNF).

United States District Court, S.D. New York.

Feb. 2, 2011.

Alejandro Brito, Melissa Lyn Bernheim, Robert Zarco, Zarco Einhorn Salkowski & Brito, P.A., Miami, FL, Jesse Owen Franklin, IV, Kevin A. Rosenfield, K & L Gates L.L.P., Seattle, WA, Steven A. Rosen, Law Offices of Steven A. Rosen, New York, NY, for Plaintiff.

Bradley Lloyd Fisher, Jennifer Lenga Long, Davis Wright Tremaine, Seattle, WA, James S. Yu, Seyfarth Shaw L.L.P., New York, NY, Dana Marjorie Orr, Louis S. Chronowski, Seyfarth Shaw LLP, Chicago, IL, for Defendants.

**DECISION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

McMAHON, District Judge:

It has been brought to the court's attention that this order was entered in violation of an automatic stay in bankruptcy; a suggestion of plaintiff's bankruptcy was filed in this action in March 2010 (Docket # 54), but the case was not transferred to the court's suspense docket. However, I am now advised that the stay has been lifted for the purpose of disposing of this action. Therefore, I direct the Clerk of the Court to strike Docket # 55 and I reissue this opinion to be entered as of today's date. We are presently trying to find a date to accommodate an early trial.

### INTRODUCTION

This diversity action arises out of a franchise relationship between the parties: the franchisee, plaintiff JM Vidal, Inc. ("Plaintiff" or "JMV"); the franchisor, defendant Texdis USA, Inc. ("Texdis"); and an affiliate of the franchisor, defendant Distex, Inc. ("Distex" and, with Texdis, "Defendants"). Plaintiff purchased and then operated an MNG by Mango ("Mango") franchise store—a retail outlet selling women's clothing—in Bellevue, Washington. The store failed, and Plaintiff filed this lawsuit, asserting claims under the Washington Franchise Investment Protection Act ("WFIPA"), Wash. Rev.Code § 19.100.010 et seq., and the New York Franchise Sales Act ("NYFSA"), N.Y. Gen. Bus. Law § 680 et seq., as well as claims for breach of the parties' franchise agreement (the "Franchise Agreement" or "Agreement"), fraud and negligent misrepresentation. Plaintiff seeks, inter alia, treble damages and re-

scission of the Franchise Agreement pursuant to the WFIPA and NYFSA.

Pending before the Court are Defendants' motion for summary judgment on all claims and Plaintiff's cross-motion for partial summary judgment on the WFIPA and NYFSA claims. For the reasons set forth below, Defendants' motion is granted in part and denied in part, and Plaintiff's motion is denied.

## BACKGROUND

### I. The Claims Asserted

Plaintiff asserts six causes of action. Count I of the Complaint alleges that Texdis violated Washington's franchise regulation statute, the WFIPA. Specifically, Plaintiff asserts that Texdis (1) offered to sell a franchise without having registered the offer with the State, in violation of WFIPA section 20; (2) did not timely deliver to Plaintiff a copy of its "offering circular," a disclosure document, in violation of section 80; (3) fraudulently misrepresented the likely sales of Plaintiff's prospective franchise (the "Store"), in violation of section 170; (4) breached its duty under section 180(1) to deal with Plaintiff in "good faith"; and (5) required Plaintiff to assent to a release relieving Texdis from liability imposed by the WFIPA, in violation of 180(2)(g). (*See* Compl. ¶¶ 57–61.) [1]

Count II alleges analogous violations of New York's franchise regulation statute, the NYFSA. (*See id.* ¶¶ 67–68.) However, as explained below, the NYFSA does not apply here.

Count III asserts a breach of contract claim against Texdis, alleging that it breached the parties' Franchise Agreement by failing to (1) fulfill its advertising and promotional obligations, and (2) provide Plaintiff with updates to Mango's Store Operations Manual. (*Id.* ¶ 75.) Count III also alleges that Texdis breached the covenant of good faith and fair dealing implied in the Agreement. (*Id.* ¶¶ 76–78.)

Count IV, the only count naming Distex, asserts a breach of contract claim against Distex, alleging that it breached the Franchise Agreement by failing to deliver merchandise to the Store in accordance with the terms of . the contract. (*Id.* ¶ 83.) Count IV also asserts a claim against Distex for breach of the implied covenant of good faith and fair dealing. (*Id.* ¶¶ 84–86.)

Counts V and VI assert claims against Texdis for fraudulent and negligent misrepresentation, respectively. Both claims are based on a representation allegedly made by Jose Gomez ("Gomez"), a Texdis executive, concerning the revenue that he expected Plaintiff's Store to generate. (*See id.* ¶¶ 88–103; Pl.'s Opp'n to Defs.' Mot. for Summ. J., Mar. 5, 2010 ("Pl.'s Opp'n"), at 24–26.)

### II. Facts

The undisputed facts relevant to the motions before the Court are taken from the parties' Rule 56.1 statements, and from certain deposition testimony, declarations and exhibits.

### A. The Parties and the Mango Franchise

Non-party Punto Fa S.L. ("Punto Fa" or "Mango"), a Spanish company, originated the Mango franchise system in Barcelona in the 1980s. (PL's Rule 56.1 Stmt., Feb. 17, 2010 ("PL's 56.1 Stmt."), ¶ 5; Defs.' Rule 56.1 Cntrstmt., Mar. 5, 2010 ("Defs.'

---

1. The Complaint does not expressly invoke WFIPA section 20 or 80, but it does allege conduct that might constitute violations of those sections, and the parties' briefs proceed on the assumption that Plaintiff has indeed asserted claims under sections 20 and 80. The Court will do the same. In any event, as discussed below, such claims are time-barred.

56.1 Cntrstmt."), ¶ 5.) Punto Fa owns and franchises Mango stores throughout Europe. (Pl.'s 56.1 Stmt. ¶ 6.)[2] There are more than 1,300 Mango stores worldwide, many of which are franchised; the rest are corporate-owned. (*See* Defs.' Rule 56.1 Stmt., Feb. 12, 2010 ("Defs.' 56.1 Stmt."), ¶ 4.) Each Mango store sells Mango-branded women's apparel and fashion accessories. (Pl.'s 56.1 Stmt. ¶ 8.)

Defendant Texdis, a Punto Fa subsidiary, is the franchisor of the Mango franchise system in the U.S. (*Id.* ¶ 2–3, 7.) Defendant Distex is a Texdis affiliate, responsible for wholesaling Mango merchandise to franchisees, including Plaintiff. (*Id.* ¶ 4.) Texdis and Distex are both incorporated under the laws of Delaware, and each has its principal place of business in New York. (Defs. ¶ 56.1 Stmt. ¶ 2; Pl.'s Rule 56.1 Cntrstmt., Mar. 5, 2010 ("Pl.'s 56.1 Cntrstmt."), ¶ 2; Compl. ¶¶ 7–8.)

Plaintiff JMV, a Washington corporation, operated a Mango franchise in Bellevue, Washington from approximately August 2006 to July 2008. (Defs.' 56.1 Stmt. ¶# 1.) JMV was incorporated by its president and primary stockholder, Jean–Marie Vidal ("Vidal"), on July 19, 2005, for the purpose of operating the Bellevue franchise. (*Id.* ¶¶ 1, 10; Decl. of Louis S. Chronowski in Opp'n to Pl.'s Mot. for Partial Summ. J., Mar. 5, 2010 ("Chronowski 3/5/10 Decl."), Ex. 1 (JMV Certificate of Incorporation).) Vidal is a French national who has lived in the U.S. since 1970. (Defs.' 56.1 Stmt. ¶ 5.) From 1960 to 1980, Vidal worked in the fashion industry as a sales agent, representing clothing lines to various retail boutiques in the U.S. and Canada. (*Id.*) Vidal again worked in the clothing industry between 1982 and 1986. (*Id.*) Prior to signing a franchise agreement with Mango, he had no franchise experience. (*Id.*)

## B. Vidal's Pursuit of a Mango Franchise

While Mango began exploring the possibility of expanding to the U.S. in 2001, it did not open its first store in the U.S. until March 2005. (Defs.' 56.1 Stmt. ¶ 6; Pl.'s 56.1 Cntrstmt. ¶ 6; Pl.'s 56.1 Stmt. ¶ 13.) Texdis, which was incorporated on March 3, 2005, did not become registered to offer and sell franchises in the State of Washington until April 28, 2005. (Decl. of Melissa L. Bemheim in Supp. of Pl.'s Mot. for Partial Summ. J., Feb. 17, 2010 ("Bernheim Decl."), Ex. A (Texdis Offering Circular) at 1; Decl. of Alan J. Schaeffer, Mar. 2, 2010, ¶ 3.)

Jean–Marie Vidal became interested in acquiring a Mango franchise as early as 1999, after visiting a Mango store in France. (Pl.'s 56.1 Stmt. ¶ 22; Defs.' 56.1 Stmt. ¶ 7.) In July 2000, Vidal had a phone conversation with Isak Halfon ("Halfon"), Punto Fa's Director of International Franchising, during which he expressed his interest in purchasing a Mango franchise store for a Seattle shopping center. (Pl.'s 56.1 Stmt. ¶ 23.)

Vidal began aggressively pursuing a Mango franchise in 2001. In a February 15, 2001 letter to Halfon, he claimed that meeting with Mango to discuss opening a Seattle store was an "emergency," and stated that he was confident a Mango franchise in Seattle would be "very successful." (Defs.' 56.1 Stmt. ¶ 7 (citation omitted).) Four days later, Vidal and Halfon met at Mango's headquarters in Barcelona. (Pl.'s 56.1 Stmt. ¶ 28.) At that meeting, Halfon gave Vidal three Mango-related brochures, one of which indicated that as of 2001, the average sales in Mango's locations around the world was roughly $900 per square foot. (*Id.* ¶ 30.) The Mango "Expansion

---

**2.** Where, as here, the Court cites to a single Rule 56.1 statement, that means the cited paragraph is expressly admitted in the corresponding Rule 56.1 counterstatement.

Brochure," as it was called, which Vidal apparently also received in 2004 or 2005, contained past sales data and forecasts for the entire chain. (*See* Bernheim Decl. Ex. EE (Mango Expansion Brochure); *id.* Ex. E (Dep. of Jean–Marie Vidal, June 16, 2009 ("Vidal Dep.")) at 59:8–60:12.)

On May 16, 2001, after a series of exchanges between Halfon and Vidal, Halfon sent Vidal a letter seeking information about a potential investor in the store, in order "[t]o take the negotiations to the next level." (Pl.'s 56.1 Stmt. ¶ 34 (citation omitted).) However, in a letter dated October 15, 2002, Halfon informed Vidal—who wished to open a Mango store in Seattle by the fall of 2003—that Mango was not considering opening shops in the U.S. before 2005. (Defs.' 56.1 Stmt. ¶ 8; Pl.'s 56.1 Cntrstmt. ¶ 8; Corrected Decl. of Louis S. Chronowski, Feb. 16, 2010 ("Chronowski Decl."), Ex. 10 (Ltr. from Halfon to Vidal, dated Oct. 15, 2002).)

Discussions between Mango and Vidal about a Seattle-area franchise picked up again in 2004. In November 2004, Jose Gomez, Texdis' Vice President of International Expansion for the U.S. and Canada, met with Vidal in Seattle and visited a potential location for Vidal's franchise, the Bellevue Square Mall (the "Mall"). (Pl.'s 56.1 Stmt. ¶¶ 35, 37, 39–40; Defs.' 56.1 Cntrstmt. ¶ 37.) In a November 29, 2004 email to Vidal, Gomez suggested that he should continue negotiating with Kevin Schreck ("Schreck"), a leasing executive at the Mall's management company, in order to secure the proposed site. (*See* Bernheim Decl. Ex. W.)

After further exchanges, on March 9, 2005, Gomez sent Vidal an email stating, "We are very close," and asking Vidal when the Mall would give them the space. (Pl.'s 56.1 Stmt. ¶ 47 (citation omitted).) In his reply, Vidal stated that "the store is waiting for us," and pushed Mango, writing, "WE NEED A FRANCHISE NOW!!!!" (Bernheim Decl. Ex. AA.) Shortly thereafter, on April 6, 2005, Vidal flew to Barcelona to meet with Halfon and Gomez regarding continued preparations for the Bellevue franchise. (Pl.'s 56.1 Stmt. ¶ 48.)

JMV alleges, and Defendants dispute, that in or around April 2005, Texdis' Gomez represented to Vidal that he expected the Bellevue franchise to generate annual sales of at least $1,000 per square foot. As the store under consideration was to be approximately 3,000 square feet, JMV claims it was led to believe that the Mango franchise would generate at least $3 million in annual sales. JMV asserts that Gomez's alleged statement was "false and misleading." (Pl.'s 56.1 Stmt. ¶¶ 56–57; Defs.' 56.1 Cntrstmt. ¶¶ 56–57.)

However, by February 2005, before Gomez's alleged misrepresentation, Vidal (with the assistance of an associate named Tom Dawson) had already prepared a business plan estimating that the Store's sales would be as high as $5 million in year one, and $6 million in year two. (*See* Chronowski Decl. Ex. 18 (Vidal Business Plan) at VIDAL 0600; Vidal Dep. 194:18–197:5; Bernheim Decl. Ex. AA (Email from Vidal to Gomez, Mar. 9, 2005 (stating that he had "sent to Isak Halfon a complete business plan")).) Vidal testified that he derived the $5 million sales forecast for year one based on "the right advertisement, . . . the right knowledge of Mango around . . . Bellevue Square, . . . [and] the type of people I had around me." (Vidal Dep. 196:23–197:5.)

In July 2005, at Texdis' request, Vidal sent his sales forecast to Texdis. (*See* Pl.'s 56.1 Stmt. ¶ 61; Defs.' 56.1 Cntrstmt. ¶ 61.) Plaintiff, relying on Gomez's deposition testimony, claims that Texdis "approved" Vidal's forecast, while Texdis disputes that characterization. (Pl.'s 56.1 Stmt. ¶ 63; Defs.' 56.1 Cntrstmt. ¶ 63.) In

fact, Gomez testified that Texdis did not challenge Vidal's numbers because Vidal was presumed to have local knowledge of the market, whereas Texdis did not. (*See* Bernheim Decl. Ex. H (Dep. of Jose Gomez, June 17, 2009 ("Gomez 6/17/09 Dep.")) at 190:3–193:21; Chronowski 3/5/10 Decl. Ex. 8 (Gomez 6/17/09 Dep.) at 196:22–198:13.)

### C. Delivery of the Offering Circular and Execution of the Franchise Agreement

A franchise "offering circular" is a form disclosure document that must be provided to prospective franchisees pursuant to the WFIPA, in accord with Federal Trade Commission regulations. *See* Wash. Rev. Code. § 19.100.080; 16 C.F.R. § 436. It is undisputed that Texdis delivered a copy of its offering circular (the "Offering Circular") to JMV by July 21, 2005. (*See* Defs.' 56.1 Stmt. ¶ 15; Pl.'s 56.1 Cntrstmt. ¶ 15.) Item 19 of the Offering Circular, titled "Earnings Claims," states that, "We do not furnish or authorize our salespersons to furnish any oral or written information concerning the actual or potential sales, costs, income or profits of [a Mango] Store. Actual results vary and we cannot estimate the results of any particular franchise." (Bernheim Decl. Ex. A at 22.)

On or about September 1, 2005, JMV entered into a ten-year lease for a space in the Bellevue Square Mall. (Pl.'s 56.1 Stmt. ¶ 67.) JMV claims, and Defendants dispute, that Texdis was "insistent" that the Mall's landlord provide JMV with a ten-year lease—despite the fact that the term of the parties' Franchise Agreement was to be only five years (with the possibility of a one-year extension). (*Id.* ¶ 65; Defs.' 56.1 Cntrstmt. ¶ 65.) Kevin Schreck, an executive at the landlord company, testi-

fied that Texdis' Gomez pushed for the ten-year lease. (Bernheim Decl. Ex. T (Dep. of Kevin Schreck, June 30, 2009 ("Schreck Dep.")), at 165:24–166:5.) On December 12, 2005, at Texdis' request, JMV signed a lease addendum permitting Texdis to take over JMV's lease in the event the franchise relationship was terminated. (Pl.'s 56.1 Stmt. ¶ 68.)

On October 25, 2005, JMV and Defendants executed the Franchise Agreement, which provided for JMV's operation of a Mango store at the Bellevue Square Mall. (*Id.* ¶ 66.) Section XXII.C of the Franchise Agreement contained a disclaimer, which Vidal initialed, stating that JMV "ha[d] not relied on any warranty or representation, expressed or implied, as to the potential success or projected income of the business venture contemplated hereby." (Chronowski Decl. Ex. 2 at 34.)[3]

### D. Failure of Plaintiff's Mango Franchise

JMV's Mango Store encountered difficulties during the pre-opening build-up phase, and performed poorly after opening in August 2006. Less than two years later, in July 2008, it closed.

#### 1. Building Cost Overruns

Texdis' Offering Circular represented that the anticipated total initial investment that a prospective Mango franchisee would have to make was between $1,009,200 and $1,124,000. (Pl.'s 56.1 Stmt. ¶ 51.) It also stated that Texdis was "unable to calculate the exact investment required of each franchisee due to the many factors that influence the total project costs." (Bernheim Decl. Ex. A at 7.)

JMV ultimately spent about $1,900,000 in order to begin operating its Mango

---

**3.** Additional provisions of both the Franchise Agreement and Offering Circular will be discussed herein, as they become relevant.

store. (Pl.'s 56.1 Stmt. ¶ 52; Defs.' 56.1 Cntrstmt. ¶ 52.) The parties dispute whether Texdis caused the additional costs. (PL's 56.1 Stmt. ¶¶ 52–53; Defs.' 56.1 Cntrstmt. ¶¶ 52–53.) Jay Reeves, Vidal's architect and project manager, testified that he was "not sure" whether the mezzanine that he constructed for JMV's Store—a mezzanine that had not been included in the original drawings, and that cost an additional $400,000—had been insisted upon by Texdis. (Pl.'s 56.1 Stmt. ¶ 53; Defs.' 56.1 Cntrstmt. ¶ 53; Bernheim Decl. Ex. DD (Dep. of Jay Reeves, June 29, 2009) at 144:12–21.) He also testified that Texdis was responsible for only a minor percentage of cost overruns caused by change orders. (Reeves Dep. 134:14–137:3.)

### 2. Advertising

The Franchise Agreement imposed certain advertising-related obligations on Texdis and JMV. The Agreement required JMV to contribute to Texdis' Advertising Fund in the amounts and at the times specified in a schedule attached to the contract. (Chronowski Decl. Ex. 2 at 18.) The Agreement further provided that, "The Advertising Fund shall be used primarily for the design and production of national and regional advertising campaigns." (Id.)

Pursuant to the terms of the Agreement, JMV was required to make an initial, pre-opening contribution to the Advertising Fund of $10,000, and Texdis was obligated to match JMV's contribution (for a total initial contribution of $20,000). (See id. at 4, Schedule 1.) The Agreement also obligated Texdis to "conduct a grand opening advertising and promotional campaign for the Store.'" (Id. at 4.)

JMV alleges that Texdis failed to fulfill its contractual advertising and promotional obligations. It is undisputed that JMV made its required initial contribution of $10,000. (See PL's 56.1 Stmt. ¶# 72;

Defs.' 56.1 Cntrstmt. ¶# 72; Chronowski Decl. Ex. 21 (Dep. of Jose Gomez, Oct. 6, 2009 ("Gomez 10/6/09 Dep.")) at 41:7–12.) It is not clear, however, whether Texdis contributed matching funds—or exactly how any such funds were used.

Texdis' Gomez claims that Texdis "contributed more money than we should have, as per the franchise agreement." (Gomez 10/6/09 Dep. 49:21–50:7.) According to Gomez, Texdis had a $20,000 "budget" for promoting the opening of JMV's Store, but once corporate "overhead" expenses (incurred in Spain) and "fixed costs"—spread among the many Mango franchise stores—were subtracted, only about $8,000 to $10,000 was left to spend on Plaintiff's Store. (Id. 47:2–4; Gomez 6/17/09 Dep. 266:21–267:13.) Texdis acknowledged that "with that amount we can't do much." (See Bernheim Decl. Ex. MM (Email from Texdis' Cristina Codina to Sihem Di Cristo, Vidal's business partner, July 5, 2006).) Another of Texdis' relatively few U.S. franchisees, Edi Tekeli, testified that when he complained to Gomez that Mango was not advertising enough on behalf of his franchise, Gomez told him that Texdis did not have enough U.S. franchisees—and, thus, advertising funds—to invest extensively in U.S. advertising. (See Bernheim Decl. Ex. KK (Dep. of Edi Tekeli, July 29, 2009 ("Tekeli Dep.")) at 159:24–160:8.)

The parties agree that most, if not all, of the advertising funds that Texdis did spend on JMV's Store were used to pay for a catalog mailing to 30,000 people living in the Bellevue area. (Pl.'s 56.1 Stmt. ¶# 73.) It is undisputed that Texdis did not conduct any research on the demographics of the people in the mailing database, and that the mailing generated only 201 responses. (Id.) Gomez testified that, in addition, Texdis placed an ad for JMV's store in the magazine Women's Wear Daily (Gomez 10/6/09 Dep. 38:23–39:4); Plain-

tiff disputes whether any such ad was ever run. It is undisputed that when Gomez was questioned regarding the true amount of the $20,000 budget actually spent advertising JMV's Store, he was unable to provide an answer. (Pl.'s 56.1 Stmt. ¶ 76.)

It is also undisputed that before the Store opened, Vidal expressed a desire to participate in the Bellevue Fall Fashion Week. (*See id.* ¶ 74; Defs.' 56.1 Cntrstmt. ¶# 74.) Texdis informed Vidal that the $20,000 advertising budget had already been depleted, so if JMV wished to participate, it would have to do so at its own expense. (*See* Gomez 10/6/09 Dep. 49:21–50:17.) JMV ended up using $2,000 of its own funds to take part in the Fall Fashion Week. (PL's 56.1 Stmt. ¶ 75.)

In addition, Gomez admitted that in 2007, Texdis did not spend $23,422 of its "spring/summer" Bellevue marketing campaign money because it lacked knowledge of the Bellevue market and did not have suitable advertising support. (Gomez 10/6/09 Dep. 93:9–96:1.) Kevin Schreck testified that as of April 2007, more than seven months after the JMV Store opened, he was not aware of any advertising for the Mango franchise in the Mall. (Schreck Dep. 202:24–203:23.)

### 3. Supply of Merchandise

The Franchise Agreement imposed obligations on Defendants with respect to the delivery of merchandise to Plaintiff's Store. The Agreement provides, inter alia, that "Distex will deliver Merchandise ... to the Store to replenish Store inventory, add new Merchandise to the product mix and make available at [JMV's] expense branded supplies." (Chronowski Decl. Ex. 2 at 5.) The Agreement also required Defendants to ship "noncommercial goods"— e.g., window displays, in-store fixtures, bags and catalogs—at JMV's expense. (Pl.'s 56.1 Stmt. ¶ 81.)

JMV asserts, and Defendants dispute, that the delivery of merchandise and non-commercial goods to the JMV Store was deficient. Several former JMV employees have testified that the Store repeatedly received clothing items that it already had in surplus, even after attempting to "block" such items through Mango's point-of-sale ("POS") ordering system; that the replenishment of merchandise was "random"—for example, the Store would receive items for seasons that had already passed; that the Store received fixtures for certain merchandise but not the actual items to display; that there were gaps— lasting several weeks—between seasons during which clothing for the new season would roll in slowly, in "chunks," preventing Store employees from putting together complete displays on the floor; and that customers would ask "when are we getting new clothes," and leave frustrated when they were told, "Maybe next week." (*See* Bernheim Decl. Ex. 00 (Dep. of Leut Diaz, July 30, 2009 ("Diaz Dep.")) at 86:23–88:5, 90:16–91:9, 93:3–16; *id.* Ex. PP (Dep. of Sara M. Pitek, June 3, 2009) at 27:17–28:19; *id.* Ex. QQ (Dep. of Lacey K. Stirkins, June 2, 2009 ("Stirkins Dep.")) at 98:5–99:9, 103:14–104:12.) One former employee remembered saying to Vidal, "Oh, it looks like we're going out of business," because the Store's displays were so "sparse." (Stirkins Dep. 104:1–12.)

Another former JMV employee testified that when daily operations issues arose at the Store—for example, when the POS system or register went down—the only phone numbers employees could call were numbers for support staff in Spain. (Diaz Dep. 42:8–44:22, 96:11–97:24.) As a result, it often took hours to reach anyone by phone, and the Spanish–English language barrier sometimes made it difficult to communicate. (*Id.*)

### 4. Resale Discussions and Closing

On May 9, 2007, less than a year after JMV's Mango Store opened, JMV's attorney sent Defendants a letter asking for a

meeting to discuss the possibility of selling the franchise back to them. (Pl.'s 56.1 Cntrstmt. Ex. D.) In June 2007, Texdis' Gomez engaged in negotiations with Schreck regarding the terms of a new lease if Texdis were to take over JMV's Store. (Gomez 10/6/09 Dep. 111:2–8.) During these negotiations, Gomez acknowledged the Bellevue Store's low sales and asked that Schreck drastically reduce the rent as a condition to Texdis taking over the location. (Pl.'s 56.1 Stmt. ¶ 86.)

At around the same time, Vidal traveled to Barcelona to discuss selling the JMV franchise back to Texdis. (*Id.* ¶ 88.) Texdis offered to purchase the franchise from JMV—which had invested over $2 million in the franchise—for a total cash payment of $150,000. (*Id.* ¶ 89.)

JMV and Texdis never reached a deal. (*Id.* ¶ 90.) JMV put money into the Store until its funds ran out, and the Store was forced to cease operations. (*Id.*) Plaintiff's Store closed in July 2008. (Defs.' 56.1 Stmt. ¶ 32; Pl.'s 56.1 Cntrstmt. ¶ 32.)

### E. Performance of Mango's U.S. Franchises

Plaintiff alleges that other Mango franchise stores in the U.S. have suffered similar fates as a result of Defendants' actions or lack thereof—Plaintiff claims that Texdis "set up franchisees to fail." (Defs.' 56.1 Stmt. ¶ 31; Pl.'s 56.1 Cntrstmt. ¶ 31.) Prior to March 2005, Mango had never operated a store or sold a franchise in the U.S. (Pl.'s 56.1 Stmt. ¶ 13.) As of March 2010, twenty Mango stores had opened in the U.S. (*Id.* ¶¶ 96–97.) When those stores opened, eighteen, including JMV's Store, were franchises, and two were corporate-owned. (*Id.* ¶ 98.) However, by March 2010, only four of the eighteen franchise stores remained open. (*Id.* ¶ 99.) Eight of the eighteen had been purchased by Defendants and become corporate-owned stores. (*Id.* ¶ 100.) As of June 2009, Defendants were engaged in negotiations with Mango's Virginia franchise—one of the four remaining U.S. franchises—to purchase it. (*Id.* ¶ 102.)

### III. The Pending Motions

Plaintiff filed its Complaint on March 27, 2008 in the Western District of Washington. On June 24, 2008, Defendants' motion to transfer pursuant to 28 U.S.C. § 1404(a) was granted, and the action was transferred to this Court.

Defendants have moved for summary judgment on all claims. They contend that certain of Plaintiff's WFIPA claims are time-barred, that the NYFSA does not apply here, and that, in any event, Plaintiff's claims under both statutes fail on the merits. Defendants also argue that Plaintiff has failed to raise a genuine issue of material fact on its contract, fraud and negligent misrepresentation claims.

Plaintiff has cross-moved for partial summary judgment. Plaintiff's notice of motion asks for summary judgment "as to Counts 1 and II"—the WFIPA and NYFSA counts, respectively—of the Complaint. (Docket No. 31.) Plaintiff's brief, however, addresses only two of the statutory violations alleged in those counts—those relating to Texdis' delivery of its Offering Circular to Plaintiff, and Texdis' registration of its franchise offer. Accordingly, the Court treats Plaintiff's motion as a motion for partial summary judgment relating to those particular aspects of Counts I and II.[4]

4. Certain facts asserted in Plaintiff's Rule 56.1 Statement accompanying its affirmative motion for partial summary judgment are relevant not to Plaintiff's motion, but rather to Defendants' motion for summary judgment on all claims. Defendants suggest that the Court should disregard such facts when resolving their motion (*see, e.g.,* Defs.' Reply in Supp. of Mot. for Summ. J., Mar. 12, 2010 ("Defs.' Reply"), at 4–5)—even though they

## DISCUSSION

### I. Standard of Review

A party is entitled to summary judgment when there is "no genuine issue as to any material fact" and the undisputed facts warrant judgment for the moving party as a matter of law. Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). On a motion for summary judgment, the court must view the record in the light most favorable to the nonmoving party and draw all reasonable inferences in its favor. *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

The moving party has the initial burden of demonstrating the absence of a disputed issue of material fact. *Celotex v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once such a showing has been made, the nonmoving party must present "specific facts showing a genuine issue for trial." Fed.R.Civ.P. 56(e). The party opposing summary judgment "may not rely on conclusory allegations or unsubstantiated speculation." *Scotto v. Almenas,* 143 F.3d 105, 114 (2d Cir.1998). Moreover, not every disputed factual issue is material in light of the substantive law that governs the case. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude summary judgment." *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505.

To withstand a motion for summary judgment, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita,* 475 U.S. at 586, 106 S.Ct. 1348. Instead, sufficient evidence must exist upon which a reasonable jury could return a verdict for the nonmoving party. Summary judgment is designed to flush out those cases that are predestined to result in directed verdict. *Lightfoot v. Union Carbide Corp.,* 110 F.3d 898, 907 (2d Cir.1997).

### II. Count I: WFIPA Claims Against Texdis

#### A. Claims Arising Under WFIPA Sections 20, 40, 80 and 180(2)(g) Are Time–Barred

JMV claims that Texdis violated the WFIPA by (1) soliciting the sale of a franchise before being registered with the State of Washington, in violation of WFIPA section 20, *see* Wash. Rev.Code § 19.100.020; (2) failing to deliver its Offering Circular to JMV far enough in advance of the sale, in violation of section 80, *see id.* §§ 19.100.040, 080; and (3) requiring JMV to assent to a release relieving Texdis of liability imposed by the WFIPA, in violation of section 180(2)(g), *see id.* § 19.100.180(2)(g). The Court need not address the merits of these WFIPA claims. They are time-barred.

##### 1. The Applicable Statute of Limitations

"Federal courts sitting in diversity look to the choice-of-law rules of the forum state." *IBM v. Liberty Mut. Ins. Co.,* 363 F.3d 137, 143 (2d Cir.2004). Where, as here, an action is transferred pursuant to 28 U.S.C. § 1404(a), "'the transferee court must follow the choice-of-law rules that prevailed in the transferor court.'" *Fin. One Pub. Co. Ltd. v. Lehman Bros. Special Fin., Inc.,* 414 F.3d 325, 333 (2d Cir. 2007) (*quoting Ferens v. John Deere Co.,*

have responded to (i.e., admitted or denied) those facts in their Rule 56.1 Counterstatement *submitted in opposition to Plaintiff's motion.* While Defendants are correct that Plaintiff should have asserted such facts as "additional" facts when opposing Defendants' motion, *see* Local Civil Rule 56.1(b), the Court will consider everything in both sets of Rule 56.1 statements in order to resolve the pending motions.

494 U.S. 516, 519, 110 S.Ct. 1274, 108 L.Ed.2d 443 (1990)). Thus, Washington's choice-of-law rules determine which state's statute of limitations applies.

■ Washington courts first "determin[e] ... which state's substantive law forms the basis of the plaintiff's claims." *See Fields v. Legacy Health Sys.*, 413 F.3d 943, 951 (9th Cir.2005); Wash. Rev.Code § 4.18.020. "Once the court decides which state's substantive law governs, that state's statute of limitations applies." *Fields*, 413 F.3d at 951. Here, Plaintiff's claims under the Washington Franchise Investment Protection Act are, of course, governed by Washington's substantive law. Accordingly, Washington law determines the applicable statute of limitations.[5]

The WFIPA statute itself does not specify a limitations period. *See* Wash. Rev. Code § 19.100.010 *et seq.* Washington courts have determined that Washington's "catch-all" statute of limitations of two years, *see id.* § 4.16.130, applies to non-fraud-based WFIPA claims of the sort presently being considered. *See Noyes v. State Farm Gen. Ins. Co.*, No. C08–5032 RBL, 2009 WL 927706, at *1 n. 3, 2009 U.S. Dist. LEXIS 26920, at *3 n. 3 (W.D.Wash. Apr. 1, 2009); *Madison House, Ltd. v. Sotheby's Int'l Realty Affiliates*, No. C06–1054P, 2007 WL 564151, at *1–2, 2007 U.S. Dist. LEXIS 11654, at *3–6 (W.D.Wash. Feb. 20, 2007); *Rand v. CM Franchise Sys., Inc.*, No. 61828–8–I, 2009 WL 667227, at *2–3, 2009 Wash.App. LEXIS 595, at *5–6 (Wash.Ct.App. Mar. 16, 2009); *Johnson v. Golf U.S.A., Inc.*, No. 42905–1–I, 1999 WL 142683, at *1–2, 1999 Wash.App. LEXIS 474, at *3–7 (Wash.Ct.App. Mar. 15, 1999). For example, in *Madison House*, the district court found that the franchisees' claim alleging that the franchisor had failed to register

its franchise in violation of WFIPA section 20 was barred by the two-year statute of limitations, 2007 WL 564151, at *2, 2007 U.S. Dist. LEXIS 11654, at *5 ("The statute of limitations on a claim for failure to register runs from the date of execution [of the franchise agreement].").

### 2. Claims Under WFIPA Sections 20, 40 and 80

■ Plaintiff's claims alleging unregistered solicitation of a prospective franchisee (WFIPA section 20) and untimely delivery of its Offering Circular (sections 40 and 80) are barred by the applicable two-year statute of limitations. It is undisputed that Texdis delivered its Offering Circular to JMV by July 21, 2005. Plainly, Plaintiff's claim based on when it received the Offering Circular had accrued, at the very latest, by the time it actually purchased its franchise on October 25, 2005. Because the Complaint was filed more than two years later, on March 27, 2008, the claim is time-barred.

■ With respect to Plaintiff's claim for the unregistered offer to sell a franchise, Washington case law makes clear that the two-year limitations period begins to run— unless the plaintiff can invoke the "discovery rule"—on the date the franchise agreement is executed. *See Madison House, Ltd. v. Sotheby's Int'l Realty Affiliates*, No. C06–1054P, 2007 WL 564151, at *1–2, 2007 U.S. Dist. LEXIS 11654, at *4–5 (W.D. Wash. Feb. 20, 2007). Plaintiff does not argue that it was unaware of when or if Texdis registered with the State of Washington (it did so on April 28, 2005). (*See* Pl.'s Opp'n at 7–9.) Nor would such an argument carry any weight—nothing in the record suggests JMV was prevented or should otherwise be excused from noting Texdis' registration status. Information

---

**5.** The parties do not expressly undertake a choice-of-law analysis, but both sides look exclusively to Washington law in disputing whether JMV's WFIPA claims are time-barred.

about registration is "commonly and publicly available," *see Madison House,* 2007 WL 564151, at *2, 2007 U.S. Dist. LEXIS 11654, at *5, and the cover page of Texdis' Offering Circular expressly alerts prospective franchisees to the issue of "state-specific registration effective dates" (*see* Chronowski Decl. Ex. 5). In short, Plaintiff's registration claim accrued when the Franchise Agreement was executed on October 25, 2005—more than two years before the Complaint was filed—and is therefore untimely.

Accordingly, Defendants' motion for summary judgment is granted as to Plaintiff's claims under WFIPA sections 20, 40 and 80. Plaintiff's cross-motion for partial summary judgment is correspondingly denied.[6]

### 3. Claim Under WFIPA Section 180(2)(g)

Section 180(2)(g) of the WFIPA prohibits a franchisor from "[r]equir[ing] [a] franchisee to assent to a release, assignment, novation, or waiver which would relieve [any person] from liability imposed by [the WFIPA]." Wash. Rev. Code § 19.100.180(2)(g). Here, Section XXI of the Franchise Agreement, titled "Release of Prior Claims," purports to release Defendants "from any and all claims relating to or arising under any franchise agreement or any other agreement between the parties executed prior to the date of this Agreement." (Chronowski Decl. Ex. 2 at 33.)

▮ Plaintiff was necessarily aware that it had assented to the release when it executed the Agreement containing the release on October 25, 2005. Thus, the two-year limitations period began to run on that date, and Plaintiff's claim under section 180(2)(g) is time-barred.

Accordingly, Defendants' motion is granted and JMV's section 180(2)(g) claim is dismissed.

### B. Plaintiff's Fraud–Based Claims Under WFIPA Section 170 Fail as a Matter of Law

The WFIPA "was enacted to deal with sales abuses and unfair practices in the franchising of goods and services." *Morris v. Int'l Yogurt Co.,* 107 Wash.2d 314, 729 P.2d 33, 35 (1986). "To protect against sales abuses, [the WFIPA] generally requires franchisors to register franchise offers with the State and to disclose material information to prospective franchisees." *Id.* The antifraud section of the WFIPA, section 170 provides, in relevant part:

It is unlawful for any person in connection with the offer, sale, or purchase of any franchise or subfranchise in this state directly or indirectly:

. . .

(2) To sell or offer to sell by means of any written or oral communication which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements made in light of the circumstances under which they were made not misleading.

(3) To employ any device, scheme, or artifice to defraud.

(4) To engage in any act, practice, or course of business which operates

---

**6.** Having granted Defendants' motion on statute-of-limitations grounds, the Court need not address Defendants' additional argument that Plaintiff's claims under WFIPA sections 20, 40 and 80 fail because Plaintiff JMV did not exist—and thus could not have been solicited—until it was incorporated on July 19, 2005.

or would operate as a fraud or deceit upon any person.

Wash. Rev. Code § 19.100.170(2)-(4).

In order to prove a WFIPA fraud claim, the plaintiff must show justifiable reliance. *See Morris*, 729 P.2d at 42. In *Morris*, the Washington Supreme Court held that in an action alleging a material omission in violation of section 170(2), "proof of nondisclosure of a material fact establishes a presumption of reliance which the defendant may rebut by proving that the plaintiff would still have purchased the franchise even if the material fact had been disclosed." *Id.* The court thus implicitly established that reliance is an element of a WFIPA fraud claim. *See id.*; *see also Rand v. CM Franchise Sys., Inc.*, No. 61828-8-I, 2009 WL 667227, at *3, 2009 Wash.App. LEXIS 595, at *8 (Wash.Ct. App. Mar. 16, 2009) (stating that a WFIPA fraud claim requires proof of each element of common-law fraud); *Kirkham v. Smith*, 106 Wash.App. 177, 23 P.3d 10, 13 (2001) (holding, in contrast to *Rand*, that section 170 applies to an unintentional misrepresentation or omission, but not questioning that reasonable reliance must be established); *Corp v. Atlantic–Richfield Co.*, 67 Wash.App. 520, 837 P.2d 1030, 1036 n. 6 (1992) (affirming dismissal of section 170(2) misrepresentation claim because plaintiffs "could not have reasonably relied" on the allegedly false statements), *rev'd on other grounds*, 122 Wash.2d 574, 860 P.2d 1015 (1993).

Although there are relatively few cases (in Washington or elsewhere) interpreting the WFIPA's antifraud provisions—especially subsections 170(3) and (4)—decisions addressing other states' franchise regulation statutes support the conclusion that justifiable reliance is an element of a WFIPA fraud claim. For example, courts interpreting nearly identical fraud sections in the Indiana, Michigan and Illinois franchise statutes have found that a fraud claim cannot stand absent evidence of reasonable reliance. *See Cook v. Little Caesar Enters.*, 210 F.3d 653, 659 (6th Cir. 2000) (Michigan); *Hardee's of Maumelle, Ark., Inc. v. Hardee's Food Sys., Inc.*, 31 F.3d 573, 578–79 (7th Cir.1994) (noting that it "would follow the holdings of the lower Indiana courts that the [Indiana franchise statute] requires proof of reasonable reliance"); *Bonfield v. AAMCO Transmissions, Inc.*, 708 F.Supp. 867, 876 (N.D.Ill.1989) (Illinois), *superseded by statute on other grounds as explained in Lewis v. Hermann*, 775 F.Supp. 1137, 1153 (N.D.Ill.1991).

■ Here, JMV's WFIPA fraud claims are based on alleged misrepresentations about the earnings prospects of JMV's Store and/or other Mango locations. These representations were allegedly made orally by Texdis' Gomez and contained in certain documents, such as Mango's Expansion Brochure. (*See* Compl. ¶ 61(b)-(d); Pl.'s Opp'n at 11–13.) Plaintiff alleges it was defrauded into purchasing the Mango franchise as a result of those misrepresentations, and that Texdis is therefore liable under WFIPA's antifraud provisions. As explained below, Plaintiff's section 170 claims fail because Plaintiff cannot show either that it actually relied on any such "earnings claims" or that such reliance was reasonable.

The express disclaimer in the Franchise Agreement precludes JMV from asserting that it reasonably relied on any purported misrepresentation concerning the prospects of its Store. Section XXII.C, which Vidal initialed on behalf of JMV, warrants that "[JMV] acknowledge[s] and accepts" that:

YOUR SUCCESS LICENSING AND OPERATING [A MANGO] STORE IS SPECULATIVE AND WILL DEPEND ON MANY FACTS INCLUDING, TO A LARGE EXTENT, YOUR

INDEPENDENT BUSINESS ABILI-TY.... **YOU HAVE NOT RELIED ON ANY WARRANTY OR REPRE-SENTATION, EXPRESSED OR IM-PLIED, AS TO THE POTENTIAL SUCCESS OR PROJECTED IN-COME OF THE BUSINESS VEN-TURE CONTEMPLATED HEREBY. NO REPRESENTATIONS OR PROMISES HAVE BEEN MADE BY U.S. TO INDUCE YOU TO ENTER INTO THIS AGREEMENT EXCEPT AS SPECIFICALLY INCLUDED HEREIN. WE HAVE NOT MADE ANY REPRESENTATION, WAR-RANTY OR GUARANTY, EXPRESS OR IMPLIED, AS TO THE POTEN-TIAL REVENUES, PROFITS OR SERVICES OF THE BUSINESS VENTURE TO YOU** AND CANNOT, EXCEPT UNDER THE TERMS OF THIS AGREEMENT, EXERCISE CONTROL OVER YOUR BUSINESS. YOU ACKNOWLEDGE AND AGREE THAT YOU HAVE NO KNOWLEDGE OF ANY REPRESENTATION MADE BY U.S. OR OUR REPRESENTA-TIVES OF ANY INFORMATION THAT IS CONTRARY TO THE TERMS CONTAINED HEREIN.

(Chronowski Decl. Ex. 2 at 34 (boldface added).) In addition, the integration clause that immediately follows provides, in relevant part, that the Franchise Agree-ment "constitute[.] the entire, full and complete Agreement between the parties hereto concerning the subject matter here-of, and ... supersede[s] all prior agree-ments. No other representations by [Tex-dis] or any third party have induced [JMV] to execute this Agreement." (*Id.*)

Section XXII.C specifically and unam-biguously disclaims reliance on *exactly* the sort of alleged representations that now underlie JMV's WFIPA fraud claims. If JMV relied on Texdis' purported "earnings claims" in purchasing its Mango franchise, any such reliance was patently unreason-able in light of its express acknowledgment to the contrary.

Furthermore, the record before the Court demonstrates the absence of any genuine issue as to whether JMV *actually* relied on Texdis' allegedly fraudulent "earnings claims." Jean–Marie Vidal, a businessman with twenty-five years of ex-perience in the clothing industry, aggres-sively pursued a Mango franchise from as early as 2001; he pushed Mango, re-peatedly assuring it that a Bellevue store would be extremely successful. He devel-oped a sales forecast for the JMV Store that was significantly *more* optimistic than any earnings claim allegedly made by Tex-dis, and he had done so by February 2005, *before* Texdis' Gomez allegedly made the statement—that the Store could be expect-ed to generate at least $ 1,000 per square foot in annual sales—upon which JMV now relies. Nor does Texdis' alleged "approv-al" of Vidal's sales forecast—which, viewed in the light most favorable to Plaintiff, was nothing more than Texdis' acceptance of Vidal's numbers—constitute the sort of misrepresentation or deceitful conduct pro-scribed by section 170. Thus, although reliance is often a question of fact for trial, no reasonable jury could find that JMV entered into the Franchise Agreement in reliance on alleged misrepresentations by Texdis.

As is apparent from the discussion above. Plaintiffs section 170 claims are based on alleged misrepresentations—namely, Texdis' purported earnings claims—not omissions. (*See, e.g.,* Pl.'s Opp'n at 12 ("Texdis has made several material misrepresentations in connection [with] its offer to sell JMV the [Mango] franchise that are prohibited by WFIPA § 170.").) However, even if Plaintiff were to cast its WFIPA fraud claims as omis-sions claims—as it did, for example, in the Complaint (*see* Compl. ¶ 61(b)-(d) (alleging

that Texdis violated section 170 by "failing to make requisite disclosures to JMV regarding its earnings claims"))—they fail just the same. For even if Plaintiff is afforded a presumption of reliance, *see Morris*, 729 P.2d at 42, Texdis has conclusively rebutted it, for the reasons set forth above.

In sum, Plaintiff's fraud-based WFIPA claims fail as a matter of law because the disclaimer and integration clause in the Franchise Agreement prevent Plaintiff from showing justifiable reliance. The record also makes clear that Plaintiff cannot prove actual reliance. Moreover, even aside from the lack of reliance, Plaintiff has failed to raise a genuine issue of fact as to whether Texdis engaged in some fraudulent "scheme" or deceitful "course of business," Wash. Rev.Code § 19.100.170(3)-(4), in selling the Bellevue franchise. Accordingly, Defendants are entitled to summary judgment dismissing Plaintiffs claims under WFIPA section 170.

### C. Plaintiffs Claim Under WFIPA Section 180(1) Raises Genuine Factual Issues

JMV alleges that Texdis violated the good-faith provision of the WFIPA, section 180(1), which requires that a franchisor and franchisee "shall deal with each other in good faith," Wash. Rev. Code. § 19.100.180(1). Washington courts have held that the duty of good faith imposed by the WFIPA "does not operate to create rights not contracted for, nor does it override the express terms of a contract." *Doyle v. Nutrilawn U.S., Inc.*, No. C09-0942JLR, 2010 WL 1980280, at *8, 2010 U.S. Dist. LEXIS 48613, at *23 (W.D.Wash. May 17, 2010) (internal quotations and citation omitted).

■ Viewed in the light most favorable to Plaintiff, the record raises genuine factual issues as to whether Texdis dealt with JMV in good faith. JMV has identified specific sections of the Franchise Agreement that Defendants allegedly breached—namely, those related to advertising and the supply of merchandise—and has presented some evidence that Defendants failed to perform these obligations in good faith. *Cf. id.* at *8, 2010 U.S. Dist. LEXIS 48613 at *23–24 (granting summary judgment for franchisor on franchisees' WFIPA good-faith claim because franchisees "do not identify any section of the Franchise Agreement that they believe [franchisor] breached, [and] do not point to any obligation imposed by the Franchise Agreement that they believe [franchisor] failed to carry out in good faith").

There is, for example, evidence in the record from which a reasonable jury could conclude that Texdis' efforts to promote the JMV Store's opening were half-hearted at best, and that, more broadly, its advertising on behalf of the Store was knowingly insufficient to afford it a chance at success. This and other evidence—such as Texdis' pushing for a ten-year lease when the term of its Agreement with JMV was only five years; Texdis' alleged insistence upon the construction of a $400,000 mezzanine not included in the original drawings; its apparent failure to provide Store employees with any U.S.-based operational support; and the strikingly poor track record of its other U.S. franchises (and, in particular, the rate at which they have been closed or repurchased)—support Plaintiff's allegation that Texdis may have been content to see the JMV Store fail, and then attempt to repurchase it at a significantly depressed price. That is the sort of "unfair" business practice that the WFIPA seeks to prevent.

Texdis' arguments in support of its motion for summary judgment on JMV's section 180(1) claim are few and flimsy. Texdis asserts that the WFIPA should be

"strictly construed" because it is "a statute in derogation of common law," and that the good-faith claim fails because Plaintiff does not allege a violation of one of the ten franchisor practices specifically prohibited by section 180(2). (Mem. in Supp. of Defs.' Mot. for Summ. J., Feb. 12, 2010 ("Defs.' Mem."), at 7.) But sections 180(1) and 180(2) are separate provisions of the WFIPA. Section 180(2) sets forth a list of ten "unfair" or "deceptive" practices that are illegal per se; it does not purport to identify every act that could constitute a breach of a franchisor's good-faith obligation. *See Coast to Coast Stores (Cent. Org.) v. Gruschus*, 100 Wash.2d 147, 667 P.2d 619, 629 (1983) (explaining that section 180(2) "does *not* require any type of bad faith," but rather "sets out specific practices which are illegal on their own," while "[section 180(1) ] is a *separate* portion of the statute imposing upon a franchisor the obligation to act in good faith").

Texdis also conclusorily asserts that "all of JMV's alleged Section 180(1) violations conflict with the parties' obligations under the Franchise Agreement." (Defs.' Mem. at 7.) To the extent that certain of Plaintiff s good-faith allegations seek to create extra-contractual obligations—which Washington courts have made clear section 180(1) cannot do, *see Doyle*, 2010 WL 1980280, at *8, 2010 U.S. Dist. LEXIS 48613, at *23, such allegations are ignored. Plaintiff's claim under WFIPA section 180(1), properly considered as predicated on Texdis' alleged failure to perform its contractual obligations in good faith, raises genuine issues of material fact, for the reasons set forth above.[7]

Thus, Defendants' motion for summary judgment on JMV's claim for breach of the WFIPA's good-faith obligation is denied.

## III. Count II: NYFSA Claims Against Texdis

Count II of the Complaint asserts claims against Texdis under New York's franchise statute, the NYFSA. Defendants argue that the NYFSA does not apply here. They are correct.

■ By its terms, the NYFSA applies only when a person offers to sell or sells a franchise in the State of New York. *See* N.Y. Gen. Bus. Law § 683(1). The statute defines when an offer or sale is made in New York:

(a) An offer or sale of a franchise is made in this state when an offer to sell is made in this state, or an offer to buy is accepted in this state, or, if the franchisee is domiciled in this state, the franchised business is or will be operated in this state.

(b) An offer to sell is made in this state when the offer either originated from this state or is directed by the offeror to this state and received at the place to which it is directed. An offer to sell is accepted in this state when acceptance is communicated to the offeror from this state.

*Id.* § 681(12). Thus, the NYFSA is "applicable only to specific transactions solicited or accepted in New York, or affecting New York." *Century Pac. Inc. v. Hilton Hotels Corp.*, No. 03 Civ. 8258, 2004 WL 868211, at *5, 2004 U.S. Dist. LEXIS 6904, at *15 (S.D.N.Y. Apr. 21, 2004) (internal quotations and citation omitted). As one court

---

7. Certain portions of Defendants' briefs can be read as suggesting that JMV's section 180(1) claim (and, indeed, all of its WFIPA claims) is time-barred. Any such suggestion is meritless. JMV's good-faith claim neces-

sarily hinges on Texdis' conduct *after* commencement of the franchisor-franchisee "relation," *see* Wash. Rev. Code § 19.100.180, during the Store's operation between 2006 and 2008—the year the Complaint was filed.

in this District stated, "The New York statute cannot have any effect whatsoever on the nationwide marketing of franchises if the franchisor elects to conduct his activities outside of this State and with non-residents." *Mon–Shore Mgmt., Inc. v. Family Media, Inc.,* 584 F.Supp. 186, 191 (S.D.N.Y.1984).

Here, there is nothing to suggest that the offer or sale of the Bellevue Mango franchise occurred anywhere other than in Washington (and, perhaps, Barcelona). The franchisee, JMV, is a Washington corporation, and its Mango franchise operated in Washington. In short, no part of the parties' transaction occurred in New York.

Plaintiff's argument that the New York statute applies is based solely on the fact that the Franchise Agreement contains a choice-of-law clause stating, "This Agreement takes effect upon its acceptance and execution by [Texdis]. This Agreement shall be interpreted and construed under the laws of the State of New York" (Chronowski Decl. Ex. 2 at 36). In advancing this argument, Plaintiff relies exclusively on the Ninth Circuit's decision in *Schwartz v. Pillsbury, Inc.,* 969 F.2d 840 (9th Cir. 1992).

In *Schwartz,* the plaintiffs, two California residents, bought an ice cream franchise located in California from Haagen Dazs, a New York corporation. *Id.* at 847. As is the case here, "no part of their transaction occurred in New York." *Id.* However, the parties' franchise agreement contained a choice-of-law clause providing not only that New York law governed, but also that "this Franchise shall be deemed to have been made in the Stale of New York, County of Bronx." *Id.* The Ninth Circuit, giving effect to the agreement's plain language providing that it must be " 'deemed' . . . to have been made in New York,' " held that the NYFSA applied. *Id.*

This case is not *Schwartz*—and the NYFSA does not apply—because the choice-of-law clause at issue here does not contain the same " 'deemed' language," *id.,* or anything like it. Judge Scheindlin's decision in *Century Pacific* is instructive. There, much like here, the plaintiff-franchisees "d[id] not allege that the franchise offers or sales were actually made in New York," but argued that "the New York choice of law provision alone is sufficient to invoke the [NYFSA]." *See* 2004 WL 868211, at *5, 2004 U.S. Dist. LEXIS 6904, at *13. The court rejected that argument, noting that where "courts have held that the [NYFSA] can reach non-New York franchises through a choice of law provision . . . the court applied the [NYFSA] specifically because the choice of law language in the franchise agreement provided that the franchise 'shall be deemed to have been made in New York.' " *Id.* at *5, 2004 U.S. Dist. LEXIS 6904 at *15 (*citing, e.g., McGowan v. Pillsbury Co.,* 723 F.Supp. 530, 536 (W.D.Wash.1989)).

In an effort to avoid the same result, JMV attempts to twist the language that *is* in the Franchise Agreement to make it fit within *Schwartz.* JMV claims that because the Franchise Agreement states that it would take effect upon "execution by [Texdis]," whose principal place of business is in New York, the Agreement must have been signed in New York and, therefore, should be "deemed" to have been made in New York. (Pl.'s Opp'n at 15.)

The argument falls flat. In contrast to *Schwartz,* the language in the Franchise Agreement's choice-of-law clause does not express a clear intent for the Agreement to be deemed to have been *made* in New York. Moreover, accepting Plaintiff's reasoning would effectively mean that *every* franchise agreement entered into by a franchisor with its principal place of business in New York would be subject to the NYFSA—in other words, the NYFSA would always apply when the franchisor is

a New York corporation. But the NYFSA could easily have said as much, and it conspicuously does not. Instead, only the *franchisee's* domicile matters for purposes of determining whether the statute applies. *See Schwartz,* 969 F.2d at 847 ("The offeror, Haagen Dazs, was a New York corporation, but under the Act this circumstance is irrelevant.")

Thus, for the reasons stated above, the Court concludes that the NYFSA does not apply. Accordingly, Texdis is entitled to summary judgment on Count II.

## IV. Count III: Breach of Contract Against Texdis

The Franchise Agreement provides that it "shall be interpreted and construed under the laws of the State of New York." (Chronowski Decl. Ex. 2 at 36.) As noted above, this Court—as the transferee court sitting in diversity—applies Washington choice-of-law rules. *See supra* Discussion II.A.1. Washington courts generally enforce contractual choice-of-law provisions with certain limited exceptions, none of which is applicable here. *See McKee v. AT & T Corp.,* 164 Wash.2d 372, 191 P.3d 845, 851 (2008); *Taylor v. 1–800–Got–Junk?, LLC,* 632 F.Supp.2d 1048, 1051 (W.D.Wash.2009). The parties agree that New York law governs JMV's claims for breach of the Franchise Agreement. (*See* Defs.' Mem. at 10; Pl.'s Opp'n at 16.) Accordingly, the Court applies New York law to Plaintiff's contract claims.

### A. Express Contract Claims Against Texdis

■ To establish a claim for breach of contract under New York law, a plaintiff must show (1) a contract; (2) performance of the contract by one party; (3) breach by the other party; and (4) damages. *Rexnord Holdings, Inc. v. Bidermann,* 21 F.3d 522, 525 (2d Cir.1994).

Plaintiff identifies three sections of the Franchise Agreement that Texdis allegedly breached. The first two, Sections III. A.9 and III.B.4, require Texdis to fulfill certain advertising-related obligations:

**III. *DUTIES OF TEXDIS USA/DISTEX***

> **A. *Pre–Opening Obligations.*** Prior to the opening of the Store:
>
> . . .
>
> 9. [Texdis] will match [JMV's] initial contribution to the "Advertising Fund" ... up to a maximum amount equal to [JMV's] required "regular contribution" [of $10,000] as set forth in Schedule 1 ... and will conduct a grand opening advertising and promotional campaign for the Store ....
>
> . . .
>
> **B. *Post–Opening Obligations.*** After the Store opens:
>
> . . .
>
> 4. [Texdis] will plan, manage and coordinate the National Advertising Fund ... and commit its resources for various national, regional and seasonal campaigns and advise [JMV] regarding those campaigns.

(Chronowski Decl. Ex. 2 at 3–5.) The Agreement defined the Advertising Fund as follows:

**X. *ADVERTISING***

> Recognizing the value of advertising, and the importance of the standardization of advertising programs to the furtherance and protection of the Marks, goodwill and public image of the System, the Parties agree as follows:
>
> **A. *Advertising Fund.*** [JMV] must make "regular contributions'" to [Texdis'] Advertising Fund in the amounts and at the times set forth on **Schedule 1** attached hereto.... The Advertising Fund shall be used primarily for the

design and production of national and regional advertising campaigns.... [JMV] understand[s] and agree[s] that [Texdis] will allocate monies in the Advertising Fund as [Texdis] deem[s] appropriate and [Texdis'] determination as to allocation of Fund resources is final and not subject to challenge.

Although the Advertising Fund is intended to be of perpetual duration, [Texdis] reserve[s] the right to terminate the Advertising Fund in [its] sole discretion....

(*Id.* at 18.)

■ Genuine, material factual issues preclude the entry of summary judgment on Plaintiff's claims for Texdis' alleged breach of Sections III.A.9 and B.4. It is undisputed that JMV made the requisite initial contribution of $10,000 to the Advertising Fund. However, it is not clear whether Texdis matched that contribution, as required by Section III.A.9, or whether and how Texdis used any such funds to advertise the JMV Store. For example, Texdis' Gomez was unable to specify how much money Texdis spent promoting the Store's opening, and the parties dispute whether and when Texdis placed ads in certain magazines. It is not possible to determine whether Texdis fulfilled its obligation to "conduct a grand opening advertising and promotional campaign for the Store." when there are factual disputes regarding what Texdis did to promote the Store. The record before the Court also sheds little light on whether Texdis planned, managed and coordinated its Advertising Fund and committed its resources to various advertising campaigns, as required by Section III.B.4. In short, factual issues make summary judgment inappropriate on Plaintiff's advertising-related contract claims.

The third contractual provision that Texdis allegedly breached, Section III.B.5, required that "[Texdis] will provide [JMV] with any updates, revisions and amendments to the [Mango Store Operations Manual (the 'Operations Manual')]." (*Id.* at 5.) Plaintiff has not mustered a single fact in support of its allegation that Texdis breached its post-opening obligation to provide JMV with Operations Manual updates. Indeed, JMV's brief in opposition to Texdis' motion does not even discuss this claim, effectively abandoning it. Moreover, Vidal has admitted that he knew he could download updates to the Manual from Mango's online system, and that he understood how to use that system. (Vidal Dep. 289:6–19.)

Accordingly, Texdis' motion is granted with respect to JMV's claim for Texdis' alleged breach of its duty to provide Operations Manual updates (Section III. B. 5). Texdis' motion is denied as to Plaintiff's advertising-related contract claims (Sections III.A.9 and III.B.4),

**B. Claim Against Texdis for Breach of the Implied Duty of Good Faith and Fair Dealing**

In addition to alleging the express contract breaches discussed above, JMV claims that Texdis breached the covenant of good faith and fair dealing implied in the Franchise Agreement. JMV argues that Texdis breached the implied covenant by, inter alia, knowingly failing to possess and/or develop the infrastructure necessary to operate a successful franchise system in the U.S., thereby allegedly depriving JMV of the opportunity to realize the benefit of its bargain.

■ "In New York, all contracts imply a covenant of good faith and fair dealing in the course of performance." *511 W. 232nd Owners Corp. v. Jennifer Realty Co.,* 98 N.Y.2d 144, 153, 746 N.Y.S.2d 131, 773 N.E.2d 496 (2002). Breach of the implied covenant is considered a breach of the underlying contract.

*Fasolino Foods Co. v. Banca Nazionale del Lavoro,* 961 F.2d 1052, 1056 (2d Cir. 1992). The covenant "embraces a pledge that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *Dalton v. Educ. Testing Serv.,* 87 N.Y.2d 384, 389, 639 N.Y.S.2d 977, 663 N.E.2d 289 (1995) (internal quotations and citation omitted). The implied duty of good faith and fair dealing "do[es] not imply obligations inconsistent with other terms of the contractual relationship," but does "encompass any promises which a reasonable person in the position of the promisee would be justified in understanding were included." *511 W. 232nd Owners Corp.,* 98 N.Y.2d at 153, 746 N.Y.S.2d 131, 773 N.E.2d 496 (internal quotations and citations omitted).

■■■■ Where, as here, a plaintiff asserts both express and implied contract claims, the plaintiff "must allege an implied duty that is consistent with the express contractual terms, but base its implied covenant theory on allegations that are distinct from the factual predicate for its contract claims." *JPMorgan Chase Bank, N.A. v. IDW Group, LLC,* No. 08 Civ. 9116, 2009 WL 321222, at *5, 2009 U.S. Dist. LEXIS 9207, at *16 (S.D.N.Y. Feb. 9, 2009) ("While independent obligations beyond those stated in the contract will not be inferred, a plaintiff adequately states an implied covenant claim by alleging conduct that subverts the contract's purpose without violating its express terms.") In other words, an implied covenant claim requires that "one party's conduct, though not breaching the terms of the contract in a technical sense, nonetheless deprived the other party of the benefit of its bargain." *Pearce v. Manhattan Ensemble Theater, Inc.,* 528 F.Supp.2d 175, 180–81 (S.D.N.Y.2007) (internal quotations and citation omitted).

■■ Here, for essentially the same reasons requiring denial of Texdis' motion on the WFIPA good-faith claim, *see supra* Discussion II.C, the Court concludes that JMV has raised genuine factual issues precluding summary judgment on its implied contract claim. JMV has presented evidence from which a reasonable jury could conclude that Texdis (1) failed to market and otherwise support JMV, and other U.S. franchisees, and thus denied JMV a fair chance at success, and (2) was content to see JMV's Store fail, and then attempt to repurchase it at a significantly lower price. This evidence includes, for example, Gomez's alleged statement to franchisee Edi Tekeli that Texdis was unable to invest extensively in U.S. advertising; Gomez's admission that $23,422 of Texdis' spring/summer 2007 Bellevue marketing campaign money was not spent because of Texdis' lack of suitable advertising support and insufficient knowledge of the Bellevue market; Texdis' apparent failure to provide any U.S.-based day-to-day operational support for JMV's store; the strikingly poor performance of Mango's U.S. franchises; Texdis' pushing for a ten-year lease when the term of its Agreement with JMV was only five years; and its offer to repurchase the Store for a cash payment of just $150,000.

Nor is JMV's implied contract claim merely duplicative of its express contract claims. Instead, JMV has presented facts supporting a reasonable conclusion that Texdis acted (or failed to act) in ways that subverted the very purpose of the Franchise Agreement—namely, the establishment of a successful Mango franchise owned and operated by Plaintiff—but that did not breach the contract's express terms (which govern the particular mechanisms of the franchise relationship). In short, JMV has presented evidence that, viewed in the light most favorable to JMV, supports the conclusion that Texdis violat-

ed certain implied promises that a reasonable franchisee would have been justified in understanding were included in the Franchise Agreement.

Finally, the Court notes that JMV's claim against Texdis for breach of the Franchise Agreement's implied covenant of good faith and fair dealing and its claim for violation of the WFIPA's good-faith obligation are duplicative in the sense that they are premised on the same contention—that Texdis failed to advertise or otherwise support JMV's Store (and other U.S. franchises), thereby denying it a chance at success, and was content to see the Store fail so it could attempt to repurchase the Store at a reduced price. However, both claims will proceed, since the WFIPA claim (but not the implied contract claim) allows for the potential recovery of treble actual damages, *see* Wash. Rev. Code § 19.100.190.

Accordingly, the Court denies Texdis' motion for summary judgment on JMV's claim for breach of the implied covenant of good faith and fair dealing.

## V. Count IV: Breach of Contract Against Distex

### A. Express Contract Claim Against Distex

Count IV of the Complaint asserts a breach of contract claim against Distex, an affiliate of Texdis responsible for wholesaling Mango merchandise to franchisees, including JMV. Plaintiff alleges that Distex breached the following provision of the Franchise Agreement:

> Distex will deliver Merchandise [defined as "MNG brand clothing lines, accessories and other products"] to [JMV's] appointed freight forwarder or to the Store to replenish Store inventory, add new Merchandise to the product mix and make available at your expense branded supplies, all on the pricing, delivery, credit and other terms and conditions as

may be established by [Texdis] from time to time. Distex has the right to discontinue, modify, substitute or add to any of [the] Merchandise. [JMV] must maintain at the Store at all times an inventory of Merchandise sufficient in quantity and variety to realize the Store's full potential, unless [JMV is] prevented from doing so as a result of [Texdis'] failure to ship Merchandise in accordance with this Agreement.

(Chronowski Decl. Ex. 2 at 1, 5.)

■ Factual issues preclude the entry of summary judgment on JMV's express contract claim against Distex. It is not clear from the record exactly how, when, or what Merchandise Distex delivered to JMV's Store. It is therefore not possible to determine whether Distex breached its obligation to replenish Store inventory and add new Merchandise to the product mix.

The only argument Distex offers in support of its motion for summary judgment on Count VI is that Vidal's deposition testimony regarding the supply of merchandise was "conclusory." (*See* Defs.' Mem. at 12–13; Defs.' Reply at 6.) In fact, Vidal's testimony on this subject—which spans more than eight pages—is moderately detailed, and supports the conclusion that Distex repeatedly shipped JMV the wrong merchandise, as well as merchandise the Store did not need because it already had the items in stock. (*See* Decl. of Melissa L. Bernheim in Resp. to Defs.' Mot. for Summ. J., Mar. 5, 2010, Ex. K (Dep. of Jean–Marie Vidal, Oct. 5, 2009) at 73:18–81:12.) Vidal had difficulty specifying the dates of particular shipments, but that does not mean the Court can simply disregard his testimony at the summary judgment stage, when credibility determinations are not to be made.

Moreover, in focusing exclusively on Vidal, Defendants ignore the fact that multiple former Store employees have testified

that Distex's delivery of merchandise and noncommercial goods was grossly deficient. They have testified, for example, that the Store received sale items for seasons that had already passed; that the Store received fixtures for merchandise but not the actual items to display; and that there were gaps between seasons during which Distex failed to deliver enough new merchandise to assemble complete floor displays.

Thus, factual issues concerning Distex's delivery of merchandise to JMV's Store render summary judgment inappropriate. The Court therefore denies Defendants' motion on JMV's claim that Distex breached Section III.B.1 of the Franchise Agreement.

### B. Claim Against Distex for Breach of the Implied Covenant of Good Faith and Fair Dealing

Count IV also asserts a claim against Distex for breach of the implied covenant of good faith and fair dealing. Plaintiff bases its implied contract claim against Distex on the allegation that Distex failed to "possess[ ] the infrastructure necessary to provide the services it agreed to provide to its franchisees, including JMV," and failed to "possess[ ] a system sufficient to administer the proper and orderly ordering and shipping of seasonal merchandise to JMV in a timely manner." (Compl. ¶ 85.)

JMV's implied contract claim against Distex fails as a matter of law because it is not supported by evidence that is distinct from the evidence supporting JMV's express contract claim against Distex. The allegation that Distex did not possess an adequate ordering and shipping system is merely an explanation of *why* it allegedly breached its express obligation to replenish Store inventory and supply new merchandise. It does not support an independent cause of action for breach of the

implied covenant of good faith and fair dealing.

By contrast, Plaintiff's viable good-faith claims against *Texdis*—both under the WFIPA and New York law—are predicated on the allegation that the franchisor of Mango stores in the U.S. essentially set JMV and other franchisees up to fail. Texdis, not Distex, is the entity that franchises Mango stores in this country; Distex's responsibility is limited to supplying merchandise to JMV's franchisees—in this case, JMV. While JMV has presented evidence raising genuine factual questions as to whether Distex failed to fulfill that contractual responsibility, that evidence cannot also serve as the basis for an implied contract claim.

Accordingly, Defendants' motion for summary judgment is granted as to Plaintiff's claim against Distex for breach of the implied covenant of good faith and fair dealing.

### VI. Count V: Fraudulent Misrepresentation Against Texdis

██ Count V of the Complaint alleges that Texdis made fraudulent representations to JMV in order to induce it to purchase a Mango franchise. The only misrepresentation identified in the Complaint and JMV's briefs as underlying its fraud claim is Gomez's alleged statement that JMV's Store could be expected to generate at least $1,000 per square foot in annual sales. JMV's fraud claim fails as a matter of law because it cannot show that it reasonably relied on any such alleged misrepresentations.

As an initial matter, the Court notes that the choice-of-law clause in the Franchise Agreement does not expressly encompass tort claims—rather, it states that, "This Agreement shall be interpreted and construed under the laws of the State of New York." (Chronowski Decl. Ex. 2 at

36.) Where a contractual choice-of-law provision does not extend to tort claims, Washington courts use a "most significant relationship" test to determine which state's law to apply, and may consider the choice-of-law clause as a factor in that test. *See Carideo v. Dell, Inc.,* 706 F.Supp.2d 1122, 1126 (W.D.Wash.2010); *see also Haberman v. Wash. Pub. Power Supply Sys.,* 109 Wash.2d 107, 744 P.2d 1032, 1066 (1987). Here, the parties assume in their briefs that New York law governs JMV's fraudulent and negligent misrepresentation claims. The Court will therefore apply New York law to those claims. *Cf. Carideo,* 706 F.Supp.2d at 1132 (assuming choice-of-law provision extended to claims as to which parties did not dispute its application).[8]

■ "To state a claim for fraudulent misrepresentation under New York law a plaintiff must show that (1) the defendant made a material false representation, (2) the defendant intended to defraud the plaintiff thereby, (3) the plaintiff reasonably relied upon the representation, and (4) the plaintiff suffered damage as a result of such reliance." *Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co.,* 375 F.3d 168, 186–87 (2d Cir.2004) (internal quotations and citation omitted). Each element of a fraud claim must be proven by clear and convincing evidence. *Dallas Aero., Inc. v. CIS Air Corp.,* 352 F.3d 775, 784–85 (2d Cir.2003).

■ Under New York law, "a general, boilerplate disclaimer of a party's representations cannot defeat a claim for fraud." *Dallas Aero.,* 352 F.3d at 785. However, "a party cannot justifiably rely on a representation that is specifically disclaimed in an agreement." *Id.* (affirming summary judgment for defendant because plaintiff could not have reasonably relied on defendant's alleged misrepresentations regarding the condition of the airplane engine it sold to plaintiff because the parties' contract "explicitly disclaim[ed] any representations about the airworthiness of the engine"). In other words, " 'a specific disclaimer [in an agreement] destroys the allegations in [a] plaintiff's complaint that the agreement was executed in reliance upon ... contrary oral representations.' " *Warner Theatre Assocs. Ltd. P'ship v. Metro. Life Ins. Co.,* 149 F.3d 134, 136 (2d Cir.1998) (*quoting Danann Realty Corp. v. Harris,* 5 N.Y.2d 317, 321, 184 N.Y.S.2d 599, 157 N.E.2d 597 (1959)). One long-recognized exception to this rule—the "peculiar-knowledge" exception—"holds that if the allegedly misrepresented facts are peculiarly within the misrepresenting party's knowledge, even a specific disclaimer will not undermine another party's allegation of reasonable reliance on the misrepresentations." *Warner,* 149 F.3d at 136.

Here, the Franchise Agreement's express disclaimer, which specifically warrants that JMV did not rely on any representation regarding the potential success of its franchise, precludes JMV from proving that it reasonably relied on Gomez's alleged statement (or others like it), just as it precludes JMV from proving reasonable reliance in the context of its WFIPA fraud claims. *See supra* Discussion II.B. Simply put, JMV's purported reliance on alleged "earnings claims," in the face of a written disclaimer specifically denying any such

---

**8.** The Court notes, however, that JMV's fraud and negligent misrepresentation claims would also fail under Washington law, which—like New York law—recognizes that a specific disclaimer can preclude a plaintiff from demonstrating reasonable reliance. *See Stewart v. Estate of Steiner,* 122 Wash.App. 258, 93 P.3d

919, 928 (2004) (affirming grant of summary judgment in securities fraud action because plaintiff-investor could not have reasonably relied on alleged oral misrepresentations in light of subscription agreement's express disclaimer stating that he had not relied on any such representations).

reliance, was unreasonable. *See, e.g., Sherman v. Ben & Jerry's Franchising, Inc.*, No. 1:08–CV–207, 2009 WL 2462539, at *2–4, 2009 U.S. Dist. LEXIS 72663, at *6–12 (D.Vt. Aug. 10, 2009) (finding plaintiff-franchisee could not have reasonably relied on Ben & Jerry's allegedly misleading earnings claims in light of express disclaimer and integration clause in franchise agreement); *Rosenberg v. Pillsbury Co.*, 718 F.Supp. 1146, 1149, 1154 (S.D.N.Y. 1989) (holding that franchisees' claim alleging that "defendants fraudulently induced them to enter into the franchise agreement ... by misrepresenting [their store's] profitability" failed as a matter of law for lack of reasonable reliance because the parties' agreement expressly disclaimed that no representation as to the potential success of the franchise was being made).

JMV does not even address the disclaimer in its papers. It does not, for example, invoke the "peculiar-knowledge" exception, and with good reason, as it has no application here. It cannot be said that facts that would have made Gomez's allegedly fraudulent projection not misleading were peculiarly within Texdis' knowledge. Around the time the statement was allegedly made, Texdis was just opening its first Mango store in the U.S., and had no experience in the Bellevue, Washington market with which Jean–Marie Vidal was so familiar. Indeed, Vidal, a businessman with twenty-five years of experience in the clothing industry, had already developed his *own* sales forecast for the Bellevue Store.

Instead of facing the disclaimer, Plaintiff merely asserts that "[t]he issue of reasonable reliance is a question of fact that must be litigated at trial and, is therefore not subject to summary judgment." (Pl.'s Opp'n at 23.) But while reasonable reliance is *often* an issue of fact for trial, summary judgment—or even dismissal at the Rule 12(b)(6) stage—is appropriate

where, as here, a specific contractual disclaimer precludes the plaintiff from proving that its reliance was reasonable. *See, e.g., Warner*, 149 F.3d at 136–37; *Dallas Aero.*, 352 F.3d at 785; *Sherman*, 2009 WL 2462539, at *4, 2009 U.S. Dist. LEXIS 72663, at *12; *Rosenberg*, 718 F.Supp. at 1153; *see also Global Mins. & Metals Corp. v. Holme*, 35 A.D.3d 93, 824 N.Y.S.2d 210, 215 (2006) ("First, we set aside the contention that issues of ... reasonable reliance are not subject to summary disposition.").

It also bears mentioning that while the Gomez statement is the only alleged misrepresentation identified in the Complaint or Plaintiff's briefs as underlying its fraudulent misrepresentation claim, Plaintiff does allude to another alleged misrepresentation in its Rule 56.1 Statement: the statement in Texdis' Offering Circular that a prospective Mango franchisee could expect to make an initial investment of between $1,009,200 and $1,124,000. (*See* Pl.'s 56.1 Stmt. ¶ 51.) JMV takes issue with this representation because it ultimately spent approximately $1,900,000 in order to begin operating its Mango store (the parties dispute whether the cost overruns were caused by Texdis).

This representation, like the Gomez projection, falls within the scope of the express disclaimer in the Franchise Agreement, which specifically warrants that JMV did not rely on any "express or implied" representation regarding "the potential success ... of the business venture," and that Texdis had not made any representations or promises to induce JMV to purchase the franchise except as provided in the Agreement itself. (*See* Chronowski Decl. Ex. 2 at 34.) Moreover, the Offering Circular, immediately after stating the estimated initial investment, expressly warns that, "We are unable to calculate the exact investment required of

each franchisee due to the many factors that influence the total project costs such as size of store, location, amount of remodeling needed, and so forth." (*Id.* Ex. 5 at 7.) In light of the above, any reliance by JMV on the Offering Circular's initial investment estimate was unreasonable as a matter of law.[9]

In sum, Plaintiff's fraudulent misrepresentation claim fails because JMV cannot show reasonable reliance. Accordingly, Defendants' motion is granted as to Count V.

## VII. Count VI: Negligent Misrepresentation Against Texdis

The elements of a claim for negligent misrepresentation under New York law are: "(1) the defendant had a duty, as a result of a special relationship, to give correct information; (2) the defendant made a false representation that it should have known was incorrect; (3) the information supplied in the representation was known by the defendant to be desired by the plaintiff for a serious purpose; (4) the plaintiff intended to rely and act upon it; and (5) the plaintiff reasonably relied on it to his or her detriment." *Hydro Investors, Inc. v. Trafalgar Power, Inc.,* 227 F.3d 8, 20 (2d Cir.2000). In determining whether the requisite "special relationship" exists, New York courts consider three factors: "whether the person making the representation held or appeared to hold unique or special expertise; whether a special relationship of trust or confidence existed between the parties; and whether the speaker was aware of the use to which the information would be put and supplied it for that purpose." *Suez Equity Investors, L.P. v. Toronto–Dominion Bank,* 250 F.3d 87, 103 (2d Cir.2001) (*quoting Kimmell v. Schaefer,* 89 N.Y.2d 257, 264, 652

N.Y.S.2d 715, 675 N.E.2d 450 (1996)). "The parties must enjoy a relationship of trust and reliance closer ... than that of the ordinary buyer and seller, and an arm's length business relationship is not enough." *DIMON Inc. v. Folium, Inc.,* 48 F.Supp.2d 359, 373 (S.D.N.Y.1999) (internal quotations and citation omitted).

JMV's negligent misrepresentation claim, like its fraud claim, is based on Texdis' alleged misrepresentations regarding the JMV Store's anticipated sales revenue (and, in particular, Gomez's allegedly misleading projection in April 2005). Thus, the negligent misrepresentation claim fails as a matter of law for the same reason the fraud claim fails—the disclaimer in the Franchise Agreement precludes JMV from establishing reasonable reliance.

JMV's negligent misrepresentation claim fails for an additional reason; JMV has not raised a genuine factual issue as to whether it and Texdis shared the requisite "special relationship." It is well established that, in general, the relationship between franchisor and franchisee does not constitute the sort of relationship needed to support a negligent misrepresentation claim. *See @Wireless Enters. v. AI Consulting, LLC,* No. 05–CV–6176 CJS(P), 2006 WL 3370696, at *13, 2006 U.S. Dist. LEXIS 79874, at *40 (W.D.N.Y. Oct. 30, 2006); *Century Pac. Inc. v. Hilton Hotels Corp.,* No. 03 Civ. 8258, 2004 WL 868211, at *8, 2004 U.S. Dist. LEXIS 6904, at *23 (S.D.N.Y. Apr. 21, 2004); *Adiel v. Coca–Cola Bottling Co.,* No. 95 Civ. 0725, 1995 WL 542432, at *4–5, 1995 U.S. Dist. LEXIS 13141, at *12 (S.D.N.Y. Sept. 13, 1995).

JMV points to no facts in the record suggesting that this case presents an ex-

---

**9.** To the extent that the Offering Circular's initial investment estimate also underlies Plaintiff's WFIPA fraud claims, it cannot give rise to liability for the same reason—lack of reliance.

626

ception to the general rule; instead, it asserts that the requisite relationship existed merely *because* Texdis was, in fact, a franchisor, and therefore allegedly "was in a special position of superiority and/or privity with JMV." (Compl. ¶ 98; Pl.'s Opp'n at 25.) That is hardly enough to survive summary judgment. Accordingly, Texdis' motion is granted as to Count VI.

### CONCLUSION

For the reasons set forth above, the Court grants in part and denies in part Defendants' motion for summary judgment, and denies Plaintiff's motion for partial summary judgment. The claims that survive Defendants' motion are: (1) Plaintiff's claim against Texdis for violation of the good-faith obligation imposed by WFI-PA section 180(1); (2) Plaintiff's claim against Texdis for breach of Sections III. A.9 and B.4 of the Franchise Agreement; (3) Plaintiff's claim against Texdis for breach of the covenant of good faith and fair dealing implied in the Franchise Agreement; and (4) Plaintiff's claim against Distex for breach of Section III.B.1 of the Franchise Agreement.